**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1489-21

IAN SMITH and FRANK
TRUMBETTI, on behalf of
TRIPLE THREAT GYM, LLC,
d/b/a ATILIS GYM BELLMAWR,

     Plaintiffs-Appellants,

v.

THE BOROUGH OF BELLMAWR,
MAYOR AND COUNCIL,

     Defendants-Respondents.

_____

Submitted September 26, 2023 – Decided July 24, 2024

Before Judges Gilson, DeAlmeida and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-3175-20.

The Law Office of John McCann, LLC, attorneys for appellants (John McCann and Giancarlo Ghione, on the briefs).

The Platt Law Group, PC, attorneys for respondents (Stuart A. Platt, on the brief).

PER CURIAM

Plaintiffs Ian Smith and Frank Trumbetti, on behalf of Triple Threat Gym, LLC, doing business as Atilis Gym Bellmawr (Atilis), appeal from the December 9, 2021 order of the Law Division: (1) denying their request to reinstate their mercantile license, which was revoked by defendants Mayor and Council of the Borough of Bellmawr for plaintiffs' failure to comply with Executive Orders imposing COVID-19-related restrictions on the operation of their gym and judicial orders enforcing those Executive Orders; and (2) dismissing their complaint in lieu of prerogative writs with prejudice. We affirm.

I.

A.    The COVID-19 Executive Orders.

On March 9, 2020, Governor Murphy issued Executive Order (EO) 103 declaring a "public health emergency" under the Emergency Health Powers Act, N.J.S.A. 26:13-1 to -36, and a "state of emergency" under the Disaster Control Act, N.J.S.A. App. A:9-33 to -63, in response to the outbreak of COVID-19 in the United States and New Jersey. Exec. Order No. 103 (Mar. 9, 2020), 52 N.J.R. 549(a) (Apr. 6, 2020). EO 103 authorized several state agencies and officials to act to protect "the health, safety and welfare" of New Jersey citizens

related to the outbreak.  Ibid.  It stated that it was "the duty of every person or entity in this State or doing business in this State" to cooperate with the State Director of Emergency Management and the Commissioner of the Department of Health (DOH) concerning the emergency.  Ibid.

On March 16, 2020, the Governor issued EO 104, which "established statewide social mitigation strategies for combatting COVID-19."  Exec. Order No. 104 (Mar. 16, 2020), 52 N.J.R. 550(a) (Apr. 6, 2020).  Based on guidance from the Federal Centers for Disease Control and Prevention, the EO set forth "social distancing" measures meant to "prevent community spread of the virus," which had been found to spread "most frequently through person-to-person contact."  Ibid.  Relevant here, EO 104 stated that "gyms" and "fitness centers," are "locations where large numbers of individuals gather in close proximity" and "come into contact with common surfaces."  Ibid.  EO 104 ordered that "[g]yms and fitness centers and classes" be closed to the public effective March 16, 2020, and remain closed "for as long as [the] Order remain[ed] in effect."  Ibid.

On March 21, 2020, the Governor issued EO 107, which classified types of businesses as "essential" and "non-essential" and ordered the closure of the latter.  Exec. Order No. 107 (Mar. 21, 2020), 52 N.J.R. 554(a) (Apr. 6, 2020).  Gyms and fitness centers were on the non-essential list.  Ibid.

On May 18, 2020, Atilis opened to the public as part of a "political rally" held there to protest the EOs' closure of non-essential businesses. On that day and the following day, the Bellmawr Police Department issued plaintiffs, who are Atilis's co-owners, summonses for violating the EOs.

On May 20, 2020, the Commissioner of DOH issued an "Emergency Closure Order" to Atilis, finding it was out of compliance with EO 107 and ordering it to "remain closed until further notice." The Commissioner ordered that "[n]o members of the public, including members of the gym, shall be permitted inside of the facility." The May 20 order stated that it was a final agency decision appealable to this court, and warned that failure to comply could result in "criminal sanctions and/or civil penalties."

Atilis did not appeal the order. Plaintiffs instead reopened the gym on May 22, 2020.

B.  The Enforcement and Contempt Proceedings.

On May 22, 2020, the Commissioner filed a verified complaint and order to show cause in the Chancery Division seeking temporary restraints and enforcement of the May 20 order. Following a hearing the same day, Judge Robert T. Lougy issued an order granting DOH's request. The order directed Atilis to remain closed to the public pending a hearing on June 8, 2020, at which

4

Atilis would be given the opportunity to show cause why an order should not be issued directing the closure of the gym and authorizing the State to secure the premises so that it would remain closed in compliance with the EOs.

On June 8, 2020, Judge Lougy entered an order granting DOH's unopposed request for preliminary restraints. On June 15, 2020, the judge entered an amended order granting restraints prohibiting "any interior recreation activity of any kind to occur" on Atilis's premises, but allowing plaintiffs to operate their nutrition/vitamin store and clothing/apparel store there.

On June 26, 2020, the Governor issued EO 157, which stated that despite a decrease in new COVID-19 cases in New Jersey, "the ongoing risks presented by" the virus meant that many of the State's protective measures needed to remain in place, "both to reduce additional new infections and to save lives." Exec. Order No. 157 (June 26, 2020), 52 N.J.R. 1455(a) (Aug. 3, 2020). EO 157 stated that gyms could open their indoor premises "to offer individualized indoor instruction by appointment only where an instructor is offering training to an individual, and the individual's immediate family members, household members, caretakers, or romantic partners." Ibid. It stated that if the gym offered multiple simultaneous instruction sessions, these needed to take place in

areas separated by a floor-to-ceiling barrier.  Ibid.  Also, all individuals present at the indoor premises of any business were required to wear masks.  Ibid.

On July 1, 2020, the Commissioner issued a "Modified Order" to Atilis, updating the May 20 order to comport with EO 157.  The Commissioner moved before Judge Lougy to enforce litigant's rights under Rule 1:10-3, alleging Atilis was not complying with the judge's orders enforcing the May 20, 2020 order or with the July 1, 2020 order.  On July 20, 2020, Judge Lougy denied the motion, finding the July 1, 2020 order superseded the May 20 order.  However, the judge ordered Atilis to comply with the July 1, 2020 order pursuant to Rule 4:67-6.

On July 23, 2020, the Commissioner filed a second Rule 1:10-3 motion, alleging that Atilis was violating the July 1, 2020 order and the court's July 20, 2020 order.  On July 24, 2020, Judge Lougy granted the motion and issued an order finding Atilis in contempt of court and stating that sanctions would be imposed in a sum "to be determined."

On July 27, 2020, Bellmawr issued criminal complaint-summonses against plaintiffs alleging non-compliance with Judge Lougy's July 24, 2020 order.  The complaints charged plaintiffs with: (1) the disorderly persons (DP) offense of obstruction, N.J.S.A. 2C:29-1(a); (2) fourth-degree contempt of a judicial order, N.J.S.A. 2C:29-9(a); and (3) the DP offense of impeding or

interfering with a person performing an authorized function, N.J.S.A. App. A:9-49(c). These complaints led to an indictment charging plaintiffs with four counts of fourth-degree contempt of a judicial order N.J.S.A. 2C:29-9(a) by kicking in plywood barricades put in place by law enforcement, opening the gym, removing a door to prevent DOH from placing a lock on it, and failing to adhere to an advisement of county health officials. On October 4, 2021, plaintiffs pled guilty to one count of the indictment. As of the date of the trial court's decision in this matter, plaintiffs were awaiting sentencing.

C.    The Mercantile License Revocation.

On June 2, 2020, plaintiffs applied to the Borough for a mercantile license for Atilis. The Borough issued the license on July 28, 2020, with an effective date of June 1, 2020. However, the same day, it issued a public notice of a "special public meeting" of the Mayor and Borough Council on August 4, 2020, at which they would consider whether Atilis's license should be revoked. The notice stated that the hearing would be conducted in accordance with the Open Public Meetings Act (OMPA), N.J.S.A. 10:4-6 to -21, and that plaintiffs would be given "an opportunity to be heard."[1]

_____

[1] Although the notice referred to a special public meeting of defendants, the parties differ on how to characterize the proceedings that took place. Plaintiffs

On July 29, 2020, the Borough sent written notice of the hearing to plaintiffs. The letter stated that revocation of their license was being considered pursuant to Bellmawr Ordinance § 266-19 (Ordinance), which provides:

> No [mercantile] license shall be issued to any person or entity which has not complied with the laws of the State of New Jersey or the ordinances of the Borough of Bellmawr providing regulations respecting the safety of the persons who may have occasion to use the premises, place or thing licensed, and in case any person licensed fails to comply with such laws and ordinances after due notice and opportunity to be heard, the Borough Council may revoke such license.

The letter stated that plaintiffs had been charged with "fourth-degree contempt, as well as obstruction and violation of a disaster control act, both disorderly persons offenses, all arising out of operations of the business . . . for which a mercantile license has been issued." It also noted that a finding of contempt had been made in the enforcement proceeding brought by DOH, and that the Attorney General issued a statement saying that law enforcement needed to enter Atilis's premises "to ensure closure of the gym and to abate the public health risks" posed by its opening in violation of the EOs and court order. The

---

refer to the proceedings as a special public meeting. Defendants refer to the proceedings as a low-level administrative hearing. Like the trial court, we refer to the proceedings as a hearing, which is the term used in N.J.S.A. 40:52-2, the statute authorizing municipalities to issue and revoke licenses.

8

A-1489-21

letter stated that plaintiffs would have the opportunity at the hearing "to present information on [their] behalf and attend in person."

On August 4, 2020, plaintiffs' counsel wrote to Bellmawr's Solicitor to ask that the hearing be adjourned until the criminal charges against plaintiffs were resolved. Counsel stated that the Borough had placed plaintiffs "in the position to make a choice between waiving their Fifth Amendment rights and defend[ing] themselves in the License Revocation proceeding or asserting their privilege and losing their license without being heard." The hearing was later rescheduled to August 11, due to a weather emergency with the parties' consent.

Just before the hearing began, Bellmawr's Solicitor provided plaintiffs' counsel with documents that defendants would consider when they made their decision. These included: (1) Atilis's license application; (2) Atilis's license; (3) the public notices of the hearing's scheduling and rescheduling; (4) copies of the Ordinance and other ordinances concerning the uses and maintenance of commercial property in the borough; (5) a copy of N.J.S.A. 40A:60-1; (6) the letter informing plaintiffs of the hearing; (7) DOH's May 20, 2020 order; (8) a certification by a police officer and the summonses he issued to plaintiffs on May 22, 2020; (9) the criminal complaint-summonses issued against plaintiffs; and (10) the May 22, 2020 and July 24, 2020 court orders.

A-1489-21

At the outset of the hearing, the Solicitor recited the Ordinance as the basis for revocation. He called four witnesses, none of whom were sworn-in.

After the documents were authenticated, the police officer explained the basis for the summons issued to plaintiffs. He stated, that "[t]he owners of the business would allow people inside to use the gym. They'd be in there for a while with their gym bags and all and then they'd come out." He also said there were "protestors" at the premises who were "shouting" that they "supported the owners" by working out. The officer personally observed these events and issued the summonses because the activities violated the EOs.

The Bellmawr Chief of Police stated that the July 27, 2020 criminal complaints are also related to violations of the EOs. He had seen "people outside the building" at Atilis, "going in and out and, you know, there was a full lot of people." Plaintiffs had moved gym equipment into the parking lot of the shopping center where Atilis is located. The officer said plaintiffs had not sought "an amended site plan or anything of a zoning nature" that would have allowed them to conduct business in the parking lot.

The Borough's Zoning and Property Maintenance Officer explained that during the week of June 28, 2020, plaintiffs had been observed "operating the[ir] business in the common parking lot" and that "large pieces of commercial

10

equipment" had been placed "on the exterior of the building." The officer stated this violated Atilis's certificate of occupancy and created a "[h]ealth and safety issue for the general public passing through the . . . shared parking lot."

At the conclusion of the witness statements, the Solicitor asked whether there were "any questions from any members of Council or the Mayor or me or anyone . . . who's provided communication." He did not ask plaintiffs' counsel if he wished to question the witnesses. The Solicitor said he would not call the witnesses' statements "testimony," because it was "not sworn testimony." He went on to say, that "[t]his is not a court of law. This is not a criminal court. This is a low-level administrative proceeding . . . ."

The Solicitor then said that before defendants could "take any action," it was "imperative" to give plaintiffs "an opportunity to defend themselves." He told plaintiffs' counsel that he could do so by "calling the owners, making representations himself, [or presenting] any kind of documents that he wanted to submit." However, there would be "no rules of evidence," as the proceeding was meant to "sort of be fairly open and informal." The Solicitor told counsel that he could say "anything that [he] want[ed] to say in defense of [his] client[s]," and that "this [was] now [his] opportunity to be heard."

11

Plaintiffs' counsel spoke on their behalf. Smith was present but did not participate; Trumbetti was absent. Counsel stated that plaintiffs had "a lot to say" and "want[ed] to speak," but were unable to because of the pending criminal charges. He argued at length that Atilis was not unsafe for the public, that there was no evidence anyone had become ill with COVID-19 as a result of going there, and that plaintiffs had instituted measures to keep the gym clean and ensure that no infected people worked out there. He asserted that the EOs were not based on science, and that the classification of some businesses as "non-essential" and subject to closure and limitations was unfair. He did not ask to question the witnesses who previously spoke, and did not present any witnesses or other evidence.

Following counsel's presentation, the Solicitor stated that he wanted to remind defendants that the issue was whether the Ordinance applied as a result of plaintiffs' violations of the EOs and court orders. He stated that the hearing "[was] not a trial" or "a criminal proceeding," but "a minor administrative proceeding" where, if defendants "believe[d] that there [had] been laws violated," they "may revoke this license." The Council voted five to one in favor of revoking plaintiffs' mercantile license.

A-1489-21

On May 27, 2021, nine months after the hearing, the borough council adopted a resolution memorializing and ratifying the revocation of plaintiffs' license. In the time between the hearing and the adoption of the resolution, the Borough issued several complaint-summonses to plaintiffs for operating Atilis without a license.[2]

D.    The Action in Lieu of Prerogative Writs.

On September 24, 2020, plaintiffs filed a complaint in lieu of prerogative writs against defendants in the Law Division. They admitted that they had opened Atilis to the public as a gym as a way to protest the EOs. They also admitted that they continued to operate the gym despite the criminal complaints against them and Judge Lougy's orders directing them to close.

They alleged that: (1) the Ordinance is unconstitutionally overbroad and vague on its face and as applied; (2) the EOs and court orders are not "laws" within the meaning of the Ordinance because they lack scientific support; (3) revocation of their license was arbitrary and capricious and violated the New Jersey Civil Rights Act (CRA), N.J.S.A. 10:6-1 to -2; and (4) defendants denied

_____

[2] Meanwhile, DOH's enforcement proceedings against plaintiffs continued, with the Commissioner filing further motions to enforce litigant's rights. On May 11, 2021, Judge Lougy issued a decision entering judgment against Atilis for contempt of court and ordering plaintiffs to pay $123,982.08 in sanctions.

A-1489-21

them procedural and substantive due process and violated the doctrine of fundamental fairness at the hearing. Plaintiffs demanded reinstatement of Atilis's mercantile license, compensatory and consequential damages, and attorney's fees and costs.

Attached to plaintiffs' written submissions to the trial court were documents purporting to show that the business closures, operating restrictions, social distancing, and masking measures imposed during the COVID-19 pandemic were "unscientific," ineffective and/or unnecessarily strict in stopping the spread of the virus. They also argued that application of those restrictions to small businesses but not to protests, such as those by the Black Lives Matter movement, was unfair. Plaintiffs submitted a certification by Smith stating that Atilis had implemented various safety measures after opening to the public. He certified that despite "250,000 visits" occurring at the gym, "not one single COVID-19 case [had] been traced to [its] location."

On September 28, 2021, the trial court heard oral argument. At the outset of the hearing, Assignment Judge Deborah Silverman Katz stated she was "not entertaining any argument whatsoever as it relates to the constitutionality of" the EOs or DOH's enforcement litigation. She added that the issues of "science" and "safety" were "not before" her, explaining that the Ordinance provides that

14

a license may be revoked on "violation of any law," without reference to the science or other "backing that goes into the law."

Plaintiffs' counsel argued that the hearing was "fundamentally unfair" and arbitrary and capricious because plaintiffs' property interest was revoked without "proper procedures." He argued that defendants should have taken sworn testimony, given plaintiffs the opportunity to conduct cross-examination, required specific fact finding, established an objective standard for license revocation, produced the documents on which defendants relied prior to the hearing, and adjourned the hearing to accommodate plaintiffs' Fifth Amendment rights. Counsel argued that these shortcomings violated the CRA, as did the Borough's issuance of summonses after the hearing but before adoption of the resolution memorializing the license revocation.

Defendants' counsel argued that defendants held a "low-level administrative hearing" that was "done to meet the due process requirements which are notice and an opportunity to be heard." He asserted that the hearing was not a "quasi-judicial" proceeding at which sworn testimony was required and that plaintiffs had the opportunity to call any witness and present any evidence in support of their position. Defendants' counsel also argued that it

15

was not improper to provide the documents at the time of the hearing, because plaintiffs were in possession or aware of all of that evidence prior to the hearing.

He further argued it was necessary to move forward with the revocation without waiting for the resolution of the criminal matters to ensure the safety of the public and promote compliance with the EOs. Counsel argued defendants' decision was not arbitrary and capricious because it was "based on substantial evidence in the record," namely plaintiffs' violations of the EOs and court orders. He also argued that plaintiffs' arguments were procedural in nature and could not support a finding that the CRA was violated.

On December 9, 2021, Judge Silverman Katz issued a comprehensive written opinion denying plaintiffs' request for relief and dismissing their complaint with prejudice. As to plaintiffs' procedural due process arguments, the judge found that plaintiffs had a property interest in their license to operate a gym. See In re Polk, 90 N.J. 550, 562 (1982). Thus, they were entitled to procedural due process at the hearing.

The judge found that plaintiffs received proper notice of the hearing. The judge found that defendants' failure to swear-in the witnesses was "not a fatal flaw," concluding that "sworn testimony is not an absolute in administrative hearings . . . ." She further found that plaintiffs had an opportunity to cross-

16

examine the witnesses and their failure "to confront the witnesses cannot be used as fodder to now claim that the opportunity to do so never presented itself." The judge found that plaintiffs' counsel did not argue before defendants, as he did in the trial court, that cross-examination of the witnesses would have been futile because they were not sworn-in.

The judge also found that plaintiffs were not prevented from calling witnesses, submitting evidence, or challenging evidence offered by the Borough. The court noted that plaintiffs' counsel addressed defendants "extensively" at the hearing, for "well over thirty[-]five minutes," arguing plaintiffs' Fifth Amendment rights were being violated, they were not being heard, tax dollars were being wasted, the hearing was "Orwellian" in nature, and there was no evidence Atilis gym was unsafe and no scientific evidence supporting the EOs.

The judge rejected plaintiffs' argument that they were not provided enough time to review the documents submitted at the hearing, finding that "[n]othing contained therein was a surprise" since the documents were already in plaintiffs' possession. Nor, the judge noted, did plaintiffs' counsel request an adjournment of the hearing in order to review the documents.

Judge Silverman Katz also found that plaintiffs' Fifth Amendment rights were not violated at the hearing. The judge noted that "a criminal defendant is

not inevitably entitled to stay a pending civil proceeding until the criminal matter is adjudicated." Instead, the judge found, the court must weigh the interests of a plaintiff in the civil proceeding with a defendant's rights against self-incrimination. The nature of the civil proceeding is relevant to the analysis of whether a stay should be issued, and a civil matter concerning the public safety should be stayed only in the most exceptional circumstances. The judge concluded that it would have been inappropriate to stay the hearing because plaintiffs' continued operation of the gym threatened public health.

As to plaintiffs' substantive due process argument, the judge found "the Borough's reliance and authority to act on a valid Order of the Superior Court which in turn relied on a valid Executive Order [was] not a violation of plaintiffs' substantive due process rights." The judge concluded that although plaintiffs believed the EOs "were issued in error, without the backing of scientific evidence," defendants' reliance on them "[did] not shock the conscience, offend judicial notions of fairness, or constitute an abuse against a property right." The judge found plaintiffs "deliberately refused" to comply with the EOs and Judge Lougy's orders despite public safety concerns, that defendants afforded them an opportunity to present their position, and that there was "nothing in the record

indicating egregious, offensive, or unfair conduct on the part of the Borough, or a violation of . . . plaintiffs' substantive due process."

The judge also found that defendants did not violate fundamental fairness, concluding plaintiffs were not subjected to oppression or harassment. The judge concluded that "[w]hile plaintiffs may disagree with the law and the resulting license revocation, subjective belief does not constitute an unfair outcome."

The judge found the Ordinance provided that a mercantile license may be revoked if there is "a violation of state or local law enacted for the safety of persons visiting the licensed premises." She found the Ordinance did not require that the premises actually be unsafe. The judge concluded, therefore, that plaintiffs' arguments that there was no proof of any specific safety hazards at Atilis were inapposite, because there was "ample proof" plaintiffs violated orders issued to protect the public. The judge also found defendants properly applied the Ordinance to revoke plaintiffs' license, and that their decision was based on sufficient credible evidence in the record and was not arbitrary or capricious.

Additionally, the judge found that defendants did not violate the CRA. In this regard, the judge found defendants did not violate plaintiffs' right to pursue an occupation, because the constitution "does not guarantee a right to a

particular job, it guarantees a right to work in general" and "the right to employment is still subject to laws that promote the general welfare." The court found there was nothing in the record indicating defendants had "deprived plaintiffs the ability to pursue any occupation or took away their general right to work."

Finally, the judge rejected plaintiffs' argument that the Borough's issuance of summonses prior to adoption of the resolution revoking their license constituted harassment and intimidation in violation of the CRA. The judge found plaintiffs were not prejudiced by the delay because they "had notice of the revocation and were not reliant on the publication of a resolution in order to learn this fact."[3]

A December 9, 2021 order memorializes the court's opinion.

This appeal followed. Plaintiffs argue the trial court erred because defendants: (1) violated plaintiffs' procedural and substantive due process rights

---

[3] The judge also found that the ordinance is not unconstitutionally vague or overbroad. Plaintiffs do not address those claims in their brief. We therefore deem any arguments with respect to those arguments waived. "[A]n issue not briefed is deemed waived." Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2024); Telebright Corp. v. Dir., N.J. Div. of Taxation, 424 N.J. Super. 384, 393 (App. Div. 2012) (deeming a contention waived when the party failed to include any arguments supporting the contention in its brief).

20

at the hearing; (2) violated plaintiffs' Fifth Amendment rights against self-incrimination by not adjourning the hearing; (3) erroneously determined that plaintiffs violated EOs and court orders, which lacked a scientific basis for the regulations imposed on the operation of their gym; and (4) violated the CRA.

II.

A.    Procedural Due Process.

Plaintiffs argue the trial court erred by concluding that at the license-revocation hearing defendants were not required to: (1) swear-in witnesses; (2) inform plaintiffs that they could cross-examine the witnesses; and (3) provide plaintiffs with the evidence on which they intended to rely prior to the hearing. Plaintiffs also argue that the hearing was not sufficiently "neutral" because defendants: (1) were both the ones who brought "forth the allegations of wrongdoing" and the ones making the decision whether to revoke the license; and (2) employed the witnesses who appeared. Plaintiffs also argue defendants were not authorized to conduct an administrative hearing. We find these arguments unpersuasive.

The Due Process Clause of the Fourteenth Amendment provides that a State may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1. The concept of "procedural due

21

process" places "constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of" this clause. Mathews v. Eldridge, 424 U.S. 319, 332 (1976).

The United States Supreme Court has held that "some form of hearing is required before an individual is finally deprived of a property interest." Id. at 333. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Ibid. (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). However, beyond this basic obligation, "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). "[N]ot all situations calling for procedural safeguards call for the same kind of procedure." Id. at 481. Thus, "a hearing closely approximating a judicial trial" is often unnecessary. Mathews, 424 U.S. at 333.

The Mathews Court found that "identification of the specific dictates of due process" in a particular case "generally requires consideration of three distinct factors." Id. at 335. These are: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest,

22

including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Id. at 335. Ultimately, "[t]he essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and [an] opportunity to meet it.'" Id. at 348 (quoting Joint Anti-Fascist Comm. v. McGrath, 341 U.S. 123, 171-72 (1951) (Frankfurter, J., concurring)). "All that is necessary is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' to insure that they are given a meaningful opportunity to present their case." Id. at 349 (quoting Goldberg v. Kelly, 397 U.S. 254, 268-69 (1970)).

The "first prerequisite" of due process is "fair notice, so that a response can be prepared and the respondent fairly heard." Nicoletta v. N. Jersey Dist. Water Supply Comm'n, 77 N.J. 145, 162 (1978). In general, meetings of a municipal governing body are subject to the requirements of the OPMA. N.J.S.A. 10:4-9. This statute mandates that except under limited circumstances, "no public body shall hold a meeting unless adequate notice thereof has been provided to the public." Ibid. "Adequate notice" is defined as "written advance notice of at least 48 hours, giving the time, date, location and, to the extent known, the agenda of any regular, special or rescheduled meeting, which notice

shall accurately state whether formal action may or may not be taken." N.J.S.A. 10:4-8(d). The notice must be "prominently posted in at least one public place reserved for such or similar announcements" and provided to at least two newspapers for publication. Ibid. While OPMA does not set forth constitutional standards for notification, its provisions provide a helpful guideline for our constitutional analysis. It is undisputed that notice was provided to plaintiffs and the public according to OPMA's standards in advance of the hearing.

To be considered adequate, the notice provided to the party whose interest is implicated must "reasonably apprise" that party of the issues to be raised at the impending proceeding. Nicoletta, 77 N.J. at 162 (internal citations omitted). "[W]here governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." Green v. McElroy, 360 U.S. 474, 496 (1959). For example, in Nicoletta, 77 N.J. at 163, the Court concluded that the letter sent to the plaintiff did not provide fair notice before the hearing on his termination, because it did not inform him of the reasons he might be fired.

We agree with the trial court's conclusion that the July 29, 2020 letter provided plaintiffs with sufficient notice of the hearing and that revocation of

their mercantile license was being considered based on the Ordinance, the full text of which was provided to plaintiffs.  The letter explained why revocation under the Ordinance might occur.  Plaintiffs thus were reasonably apprised of the reasons for the action contemplated against their license.

We also find no error in the trial court's conclusions with respect to the adequacy of the opportunity to be heard at the hearing.  In general, when assessing the sufficiency of a proceeding, "fairness and not rigid formality should be the touchstone."  Nicoletta, 77 N.J. at 164.  The procedural requirements for a hearing may vary depending on the interests involved, "the goal being to minimize the possibility of error or injustice, rectifiable in any case by subsequent judicial review."  Ibid.

N.J.S.A. 40:52-2 states that the governing body of a municipality may "impose penalties for violation of ordinances providing for licenses, and revoke any license for sufficient cause and after notice and a hearing."  This provision does not give any detail as to the procedures that must be provided at such a hearing.  By contrast, N.J.S.A. 40:55D-10, which concerns municipal hearings on applications for land development, explicitly states that witness testimony "shall be taken under oath" and that "the right of cross-examination shall be permitted to all interested parties."  This suggests that where the Legislature has

25

intended to require municipalities to observe these procedural requirements, it has included express language to that effect in the relevant statute. See In re Freshwater Wetlands Statewide Gen. Permits, 185 N.J. 452, 463-66 (2006) (distinguishing between instances where a trial-type hearing before an agency or municipality is expressly provided for by statute and those where no such requirement is set forth by the Legislature).

In Freshwater Wetlands, the Court found that under Mathews, due process may require some form of hearing, but not necessarily one involving trial-type procedures. Id. at 467-69. Even where there are "disputed facts" at issue, and a "particularized property right" at stake, due process may be satisfied "even absent trial-type procedures." Id. at 469-71. Indeed, a hearing may satisfy due process even if it occurs after an initial deprivation of property has occurred, so long as the affected party is later given an opportunity to be heard "in a meaningful manner." Rivkin v. Dover Twp. Rent Leveling Bd., 143 N.J. 352, 372-73 (1996) (quoting Parratt v. Taylor, 451 U.S. 527, 540 (1981)).

The right to a trial-type hearing in an administrative proceeding is "generally limited to the situation where adjudicatory facts – that is, facts pertaining to a particular party – are in issue." High Horizons Dev. Co. v. State, 120 N.J. 40, 49 (1990) (internal citation omitted). "[I]t is the presence of

26

disputed adjudicative facts, not the vital interests at stake, that requires the protection of formal trial procedure." Id. at 53. This principle "has been held to apply even when the governing statute appears to mandate an evidentiary hearing." Contini v. Bd. of Educ. of Newark, 286 N.J. Super. 106, 120 (App. Div. 1995). Thus, "so long as the parties had adequate notice [and] a chance to know opposing evidence, and to present evidence and argument in response, due process would be fundamentally satisfied" even without a trial-type hearing. High Horizons, 120 N.J. at 53.

More specifically concerning cross-examination of witnesses, the High Horizons Court stated that if, for example, a question in a matter "turns on expert opinion relied on by the agency, one must be able to contest the bases of the opinion." Id. at 51. However, it held that "due process does not always require the opportunity to cross-examine expert witnesses, so long as the opportunity to meet and rebut the expert analysis is afforded, because 'the credibility and veracity of the witnesses [is] not usually at issue.'" Id. at 52 (quoting Shoreline Assocs. v. Marsh, 555 F. Supp. 169 (D. Md. 1983))(alteration in original).

By contrast, in Limongelli v. N.J. State Bd. of Dentistry, 137 N.J. 317, 328-29 (1993), the Court found that the defendant agency was required to allow the plaintiff to cross-examine the witness who had raised allegations that he had

been working as a dentist without a license. The Court found that the witness's account may have been "one-sided" and geared toward avoiding administrative action against himself, and concluded that under those circumstances, where the issues in dispute were "highly fact-sensitive," a chance to cross-examine was necessary. Ibid.

We have held that "unless required by statute, rule or regulation, sworn testimony of witnesses in administrative proceedings need not be taken." In re Stowman, 200 N.J. Super. 507, 511 (App. Div. 1985). In Stowman, a hearing was held by the appellant's State employer concerning his suspension from work. Id. at 508-10. The appellant requested that his witnesses be sworn, the hearing officer refused, and the appellant's counsel then declined to present the witnesses; the suspension was upheld. Id. at 510. We rejected the appellant's contention that the hearing officer denied him due process by failing to swear witnesses, finding that such "formalities" are only required in "formal adversarial proceedings" and must be "predicated upon some basic statute or rule." Id. at 511.

In light of these precedents, we agree with the trial court that defendants were not required to conduct a trial-type hearing with sworn testimony or to inform plaintiffs' counsel that he could cross-examine the witnesses called by

28

the Borough. There were no adjudicative facts in dispute. The Ordinance states that a mercantile license cannot be held by someone who violates State law intended to protect the safety of their customers. At the time of the hearing, Judge Lougy had already found that plaintiffs violated the EOs by opening Atilis Gym and that they had resisted DOH's and the court's efforts to bring them into compliance. Plaintiffs did not deny violating the EOs; their argument in both proceedings was that they disagreed with the Governor's orders and should not have to obey them. Thus, there was no need for a full trial-type hearing to discern the facts of the case or test any witness's credibility. We note that at the hearing, plaintiffs' counsel did not request that the witnesses be sworn, even after the Solicitor remarked that their statements were "not sworn testimony."

As to cross-examination, plaintiffs' counsel was informed of his chance to present plaintiffs' case. Nothing in the record suggests that a request by him to question the witnesses, if made, would have been denied. A governing body should not be held to have violated due process if it has made procedural protections available, but the plaintiff has refused or failed to avail themselves of those protections. Plemmons v. Blue Chip. Ins. Servs., Inc., 387 N.J. Super. 551, 567 (App. Div. 2006). Additionally, the majority of the evidence presented by the Borough was documentary, leaving little to cross-examine. High

Horizons, 120 N.J. at 50-51.  Plaintiffs had an "opportunity to meet and rebut" that evidence through their counsel's arguments, id. at 52, and the credibility of the witnesses was not heavily in question as in Limongelli, 137 N.J. at 328-29.

We also agree with the trial court's conclusion that defendants' failure to provide some evidence prior to the date of the hearing did not violate plaintiffs' procedural due process.  As the court found, plaintiffs were in possession of the documents on which the Borough relied prior to the hearing.  They had a copy of their license, were given the text of the ordinance in the notice of the hearing, and were informed the court orders issued by Judge Lougy would be considered.  Plaintiffs were given copies of those documents just before the hearing.  So, plaintiffs have not shown any prejudice.  While it may have been a better practice to exchange the evidence before the day of the hearing, defendants' failure to do so did not render the revocation hearing constitutionally deficient.

We are not persuaded by plaintiffs' arguments that the hearing was not neutral.  While a hearing tribunal should be "neutral and detached," this does not mean that its members must be completely "disassociated from the administrative process."  Nicoletta, 77 N.J. at 163.  See Williams v. Civ. Serv. Comm'n, 66 N.J. 152, 159-60 (1974) (finding there was "minimal" danger of "injustice resulting from bias" if hearing on plaintiff's discharge from municipal

employment was conducted by the governing body of the municipality); Cermele v. Twp. of Lawrence, 260 N.J. Super. 45, 47 (App. Div. 1992) (finding that in the absence of "actual bias shown," there was "no problem" with plaintiff's municipal employer being both the party advancing disciplinary charges against him and the body deciding whether to suspend him). A licensing body with "the power to impose sanctions which include license revocation" must be permitted to carry out that power so long as "appropriate procedural safeguards" are employed. In re A-1 Jersey Moving and Storage, Inc., 309 N.J. Super. 33, 40 (App. Div. 1998).

Nothing in the record suggests bias by defendants against plaintiffs or that they could not fairly consider whether revocation of the license was warranted. Nor is there evidence defendants put pressure on the witnesses to provide certain testimony. Plaintiffs' arguments, if adopted, would prohibit municipalities from enforcing their ordinances, simply because some of their officials would raise the allegations and other officials would decide if the ordinances had been violated. We cannot support this unworkable and unnecessary conclusion.

B.    Substantive Due Process.

The Fourteenth Amendment bars certain government actions regardless of the fairness of the procedures used to implement them. Cnty. of Sacramento v.

Lewis, 523 U.S. 833, 839 (1998).  The "touchstone" of this substantive "due process" aspect of the Amendment is "protection of the individual against arbitrary action of the government."  Wolff v. McDonnell, 418 U.S. 539, 558 (1974).  It prohibits "the exercise of power without any reasonable justification in the service of a legitimate governmental objective."  Sacramento, 523 U.S. at 846.  The Due Process Clause is "intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'"  Collins v. City of Harker Heights, 503 U.S. 115, 126 (1992) (quoting DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 196 (1989)).

The United States Supreme Court has "always been reluctant to expand the concept of substantive due process."  Id. at 125.  In cases alleging "abusive executive action," it has "repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'"  Sacramento, 523 U.S. at 846 (quoting Collins, 503 U.S. at 129).  Thus, the level of executive abuse of power that is cognizable under the Fourteenth Amendment is "that which shocks the conscience."  Ibid.  The type of official action most likely to rise to this level is "conduct intended to injure in some way unjustifiable by any government interest."  Id. at 849.  "[A]llegations that the government's actions in a particular case were motivated by bias, bad faith, or improper

motive, such as partisan political reasons or personal reasons . . . may support a finding of substantive due process violation." Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 683 (3d Cir. 1991).

To establish a violation of substantive due process, a claimant must demonstrate that he or she had a "right or interest of special or fundamental significance" that was impeded or taken away in some manner by the government. Felicioni v. Admin. Off. of the Cts., 404 N.J. Super. 382, 393 (App. Div. 2008). He or she must "clearly identif[y]" the "fundamental liberty interest" at issue and show that this interest is "objectively and deeply rooted in the traditions, history, and conscience of the people of this State." Lewis v. Harris, 188 N.J. 415, 435 (2006).

If a claimant establishes that he or she held a fundamental right that was injured, he or she must then show either that the means chosen by the government "unduly interfere[d] with the special right or interest so as to render invalid the contemplated reach of governmental action, or that there is an effective lack of a rational relationship between the means chosen and the end to be achieved." Felicioni, 404 N.J. Super. at 393.

In Rivkin, 143 N.J. at 366, our Supreme Court found that "the denial of a property right in the context of municipal governance rarely will rise to the level

of a substantive due process violation." Ordinarily, "when property rights are denied in the course of conventional municipal decisionmaking," there is no such violation. Id. at 368. Thus, "official misconduct that deprives one of a property interest" may violate due process only "in limited instances, as when a government body's actions are motivated by racial animus or political or personal bias." Id. at 367. Ultimately, "substantive due process protections should be reserved for 'truly irrational' governmental abuses that bear no relationship to the merits of the pending matter." Id. at 370 (quoting Lemke v. Cass Cnty., 846 F.2d 469, 472 (8th Cir. 1987) (Arnold, J., concurring)).

Plaintiffs argue that their rights to work and to employment opportunity were infringed by defendants through the revocation of their mercantile license. In Truax v. Raich, 239 U.S. 33, 41 (1915), on which plaintiffs rely, the United States Supreme Court held that "the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." In Greenberg v. Kimmelman, 99 N.J. 552, 570 (1985), the our Supreme Court similarly found that "[t]he right to employment opportunity, although not a fundamental right, remains a [F]ourteenth [A]mendment liberty interest that is protected against arbitrary governmental interference."

In Truax, 239 U.S. at 35, a statute required that certain employers employ at least eighty percent native-born citizens or qualified electors. The Court held that this violated substantive due process because it "den[ied] to lawful inhabitants, because of their race or nationality, the ordinary means of earning a livelihood." Id. at 41. By contrast, in Greenberg, 99 N.J. at 573-74, the Court found no violation of substantive due process where a statute prohibited family members of State employees from working at casinos. In so holding, the Court stated that "[t]he right to a particular job, unlike the right to work in general, has never been regarded as fundamental." Id. at 573. The Greenberg Court also observed that "the right to employment opportunity is subject to reasonable measures to promote the general welfare" under both the federal and State constitutions. Id. at 571. It concluded that the plaintiff, the spouse of a judge who wanted to work in a casino, did not enjoy a fundamental right to such employment, and that if she did, the statute banning her from such a job was valid under the Fourteenth Amendment because "[t]he state interest in preserving the integrity of the judiciary outweigh[ed] her interest in unrestricted employment opportunities." Id. at 574-76.

We agree with the trial court's conclusion that defendants did not violate plaintiffs' substantive due process rights. Unlike in Truax, the revocation of

A-1489-21

plaintiffs' mercantile license did not impede them in the exercise of their right to work generally.  Instead, as in <u>Greenberg</u>, it prevented them from working in one particular capacity within one municipality.  As such, no "right or interest of special or fundamental significance" was implicated in this matter.  <u>Felicioni</u>, 404 N.J. Super. at 393.

Moreover, even if plaintiffs had a fundamental right to their license, defendants' actions did not "shock the conscience."  <u>Sacramento</u>, 523 U.S. at 846.  Plaintiffs willfully and repeatedly violated the Governor's COVID-19-related EOs, which were meant to protect public safety during a widespread health emergency.  There is nothing in the record indicating that defendants' decision was "motivated by racial animus or political or personal bias" or any other improper consideration.  <u>Rivkin</u>, 143 N.J. at 367.

C.    <u>Fifth Amendment.</u>

The decision whether to stay a proceeding is discretionary, and thus must be reviewed for an abuse of that discretion.  <u>Avila v. Retailers & Mfrs. Distrib.</u>, 355 N.J. Super. 350, 354 (App. Div. 2002).  An abuse of discretion "arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'"  <u>Flagg v. Essex Cnty.</u>

Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. INS, 779 F.2d 1260, 1265 (7th Cir. 1985)).

The Fifth Amendment provides that no person shall be compelled to be a witness against themselves in a criminal case. Lefkowitz v. Turley, 414 U.S. 70, 77 (1973). It protects an individual not only from being called as a witness against themself in a criminal prosecution, but also from being forced to "answer official questions put to him [or her] in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him [or her] in future criminal proceedings." Ibid. The privilege thus is not "dependent upon the nature of the proceeding in which the testimony is sought or is to be used," but instead "applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it." McCarthy v. Arndstein, 266 U.S. 34, 40 (1924).

In State v. Melendez, 240 N.J. 268, 272 (2020), the Court addressed the requirement of N.J.S.A. 2C:64-3(d) that a person who wishes to assert a claim to an asset seized by law enforcement must respond to the State's forfeiture complaint within a time limit. Ibid. If the same person faces criminal charges related to the seized property, a response to the forfeiture complaint could incriminate him. To assert his right not to be deprived of the property without

due process, he must "link [himself] to alleged contraband and give up [his] constitutional right against self-incrimination." Id. at 282. The Court concluded that this was an "untenable situation." Id. at 272.

Plaintiffs relies on Melendez in arguing that defendants violated their Fifth Amendment rights by refusing to stay the hearing until their criminal charges were resolved. The holding in Melendez, however, does not support their position. In Melendez, the Court did not hold that the forfeiture proceeding must be stayed until pending criminal charges had been resolved. Instead, the Court held that an individual's response to a forfeiture complaint could not be used against him or her in a criminal case. 240 N.J. at 282. Similarly, in Lefkowitz, the Supreme Court held that if a witness is compelled to provide testimony in one action, "his answers are inadmissible against him in a later criminal prosecution." 414 U.S. at 78. The Court also held that a statute could not force someone to give up this immunity "under threat of substantial economic sanction" if they refused. Id. at 82.

The holding in State v. Kobrin Securities, Inc., 111 N.J. 307, 310 (1988), is more apt here. In Kobrin, defendants in a civil action by the State alleging securities fraud, "having learned of . . . criminal investigations into their affairs," refused to answer discovery requests, asserting their right against self-

incrimination.  Id. at 311.  The trial court, on its own motion, stayed the civil action on Fifth Amendment grounds.  Id. at 312.  The Supreme Court reversed, holding that the defendants could choose to assert their Fifth Amendment privilege in the civil action, but had no right to "be relieved of the burden of that choice" by a stay.  Id. at 312-13 (quoting DeVita v. Sills, 422 F.2d 1172, 1178 (3rd Cir. 1970)).  In other words, "the fact that a [person] is indicted cannot give him [or her] a blank check to block all civil litigation on the same or related underlying subject matter."  Id. at 314 (quoting Gordon v. Fed. Deposit Ins. Corp., 427 F.2d 578, 580 (D.C. App. 1981)).

The Kobrin Court found that when deciding whether to stay a civil proceeding pending resolution of criminal charges, courts must decide if refusing a stay "would thereby expose to unnecessary adverse consequences the defendant exercising the constitutional privilege."  Ibid.  "[C]onsideration[s]" to "guide the court" are "whether the civil proceeding seeks only a monetary recovery by government against a defendant" and "whether the two actions are nearly identical in scope."  Ibid.  Notably, the Court held that "when relief is sought to prevent continued injury to the public . . . the civil proceedings should not be stayed except in the most unusual circumstances."  Ibid.

In Kobrin, the Court noted that many of the defendants in the civil fraud action had continued to sell securities and remained "free from obligation" to investors who had alleged serious financial losses due to their conduct because of the stay the trial court had granted. Id. at 315. It held that the stay had benefited the defendants "without any consideration of the rights of the civil claimants." Ibid. It therefore reasoned that if any of the defendants were "unqualified to serve in [their] profession," the civil proceedings against them "[could] not be stayed." Ibid. As a result, it remanded for further proceedings, in which any defendants wishing to assert their Fifth Amendment privilege would need to demonstrate how discovery would impose "burdens" on them that "outweigh[ed] the public interest" in the civil action going forward. Id. at 316.

Here, as in Kobrin, plaintiffs' continued conduct would have posed a risk of "continued injury to the public" if a stay of the hearing had been entered. Id. at 314. A stay would have allowed plaintiffs to continue operating their gym in defiance of the EOs and DOH orders intended to protect the public.

Additionally, defendants did not question Smith at the hearing or seek to compel Trumbetti to appear and speak. Thus, unlike in Melendez, plaintiffs were not forced by statute or defendants to make any incriminating statements. There was no "undue hardship" placed on plaintiffs by requiring them to choose

whether to assert their Fifth Amendment privilege at the revocation hearing. Id. at 312-14.

D.      Civil Rights Act.

The CRA provides, in relevant part:

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.
>
> [N.J.S.A. 10:6-2(c).]

The CRA is "modeled off of the analogous Federal Civil Rights Act, 42 U.S.C. § 1983," and both protect "rights, not the broader or vaguer 'benefits' or 'interests,'" from deprivation and interference. Harz v. Borough of Spring Lake, 234 N.J. 317, 330-31 (2018). However, the CRA differs from the federal statute in that the latter provides remedies related to both procedural and substantive rights while the former provides them only for violations of substantive rights. Tumpson v. Farina, 218 N.J. 450, 477 (2014). The plaintiff in a CRA suit has the burden to show that the right claimed to be violated is substantive. Id. at

41

478. Substantive rights encompasses "those rights and duties that may give rise to a cause of action," while procedural rights refers to "the manner and the means by which those rights and duties are enforced." Ibid. (internal quotations omitted). Substantive rights include those in the United States Constitution, such as the rights to free speech and to acquire, possess, and protect property, those identified in constitutional jurisprudence, such as the right to privacy, and those conferred explicitly by a statute. Harz, 234 N.J. at 332.

"Private property rights are not absolute" are "always subject to the reasonable exercise of the police power." David v. Vesta Co., 45 N.J. 301, 311 (1965). Plaintiffs' decision to willfully violate the EOs and Judge Lougy's orders led to the revocation of their license. There is nothing in the record to suggest that defendants' decision was a product of "nefarious" motives or that they "engaged in illicit 'threats, intimidation or coercion'" against plaintiffs. State v. Quaker Valley Farms, LLC, 235 N.J. 37, 64 (2018) (internal citation omitted). Instead, the revocation was undertaken pursuant to a valid ordinance after a hearing at which plaintiffs had an adequate opportunity to challenge allegations that they had violated laws intended to protect the safety of their customers.

Contrary to plaintiffs' assertions, the record contains no evidence that defendant revoked their license as retaliation for the exercise of their First

42

Amendment rights. While members of the borough council mentioned the protests taking place at the gym and in the adjacent parking lot before and at the hearing, they did so only in the context of concerns relating to the protection of the public and maintaining order in a public space. Our review of the record reveals no violation of the CRA.

We also agree with the trial court's conclusion that the Borough's issuance of summonses to plaintiffs for operating a business without a license, after the hearing but prior to adoption of the resolution memorializing the revocation, did not violate the CRA. As the trial court noted, plaintiffs were made aware that their license had been revoked at the hearing, and passage of a formal resolution was not necessary to inform plaintiffs of defendants' decision.

To the extent we have not specifically addressed any of plaintiffs' remaining contentions, including their collateral attacks on the scientific validity of the EOs, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

43

A-1489-21